**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIAN KEIPPEL, derivatively on behalf of CENTENE CORPORATION, | Case No.: 1:25-cv-06737 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| SARAH M. LONDON, ANDREW L. ASHER, JESSICA L. BLUME, KENNETH A. BURDICK, CHRISTOPHER J. COUGHLIN, H. JAMES DALLAS, WAYNE S. DEVEYDT, FREDERICK H. EPPINGER, MONTE E. FORD, THOMAS R. GRECO, THEODORE R. SAMUELS, and KENNETH Y. TANJI, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| CENTENE CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Julian Keippel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Centene Corporation ("Centene" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Sarah M. London ("London"), Andrew L. Asher ("Asher"), Jessica L. Blume ("Blume"), Kenneth A. Burdick ("Burdick"), Christopher J. Coughlin ("Coughlin"), H. James Dallas ("Dallas"), Wayne S. DeVeydt ("DeVeydt"), Frederick H. Eppinger ("Eppinger"), Monte E. Ford ("Ford"), Thomas R.

Greco ("Greco"), Theodore R. Samuels ("Samuels"), and Kenneth Y. Tanji ("Tanji"), (collectively, the "Individual Defendants," and together with Centene, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Centene, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants London and Asher for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Centene, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Centene's current and/or former directors and officers from December 12, 2024 through June 30, 2025, both dates inclusive (the "Relevant Period").

2.      Centene is a Delaware corporation headquartered in St. Louis, Missouri, which positions itself as a leading healthcare organization committed to enhancing health outcomes. The Company claims to implement a localized strategy, leveraging regional brands and teams, to deliver integrated, high-quality, and cost-efficient healthcare services, primarily through government-sponsored and commercial programs.

3.     Centene highlights its mission to serve underinsured and uninsured populations, asserting that it provides affordable, quality healthcare coverage to more than one in fifteen people in the United States. This includes individuals covered under Medicaid and Medicare, as well as those enrolled through the Health Insurance Marketplace. As of 2024, Centene operated through four main business segments: Medicaid, Medicare, Commercial, and Other.

4.     Throughout the Relevant Period, the Individual Defendants provided investors with material information regarding the Company's expected revenue and adjusted diluted earnings per share ("EPS") guidance for fiscal year 2025. These communications expressed confidence in the Company's enrollment levels, morbidity rates, and strong retention within its Medicare business.

5.     Despite making these positive statements to investors, the Individual Defendants simultaneously issued materially false and misleading representations and/or failed to disclose significant adverse information about Centene's actual enrollment figures and morbidity rates. By omitting these material facts, they caused investors to purchase Centene securities at artificially inflated prices.

6.     The truth emerged on July 1, 2025, when Centene released a press statement retracting its 2025 financial guidance. Following a detailed review of the 2025 Health Insurance Marketplace, it was revealed revealed that the Company's overall market growth across 22 states, representing 72% of its marketplace membership, was below expectations. Consequently, the Company revised its guidance, lowering its revenue projection to approximately $1.8 billion and its adjusted diluted EPS to $2.75.

7.     On this news, the price of the Company's stock fell $22.87 per share, or 40.4%, from a closing price of $56.65 per share on July 1, 2025, to close at $33.78 per share on July 2, 2025.

8.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Centene, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) public representations about the Company's financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (2) the Company's enrollment figures were materially overstated and  morbidity trends were misrepresented across Centene's business segments, especially in the Medicare segment; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.    Additionally, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***approximately $442.3 million*** to repurchase approximately 7,432,000 shares of its own common stock at artificially inflated prices from December 2024 to May 2025. In total, this caused the Company to overpay for repurchases of its own stock by approximately $191.2 million.

11.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected

the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants London and Asher's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's

claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York, or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Centene. Plaintiff has continuously held Centene common stock at all relevant times.

### Nominal Defendant Centene

20.     Centene is a Delaware corporation with its principal executive offices at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CNC."

**Defendant London**

21.    Defendant London has served as a Company director since September 2021 and as the CEO of the Company since March 2022.

22.    According to the Schedule 14A the Company filed with the SEC on March 27, 2025 (the "2025 Proxy Statement"), Defendant London received $20,602,148 in compensation for the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). This included $1,400,000 in salary, $14,630,132 in stock awards, $4,289,125 in non-equity incentive plan compensation, and $282,891 in all other compensation.

23.    The 2025 Proxy Statement stated the following about Defendant London:

EXPERIENCE:

**Centene Corporation**

- Chief Executive Officer (March 2022 to present)
- Vice Chairman (September 2021 to March 2022)
- President, Health Care Enterprises and Executive Vice President, Advanced Technology (March 2021 to September 2021)
- Senior Vice President, Technology and Modernization (September 2020 to March 2021)

**Optum Ventures,** a division of UnitedHealth Group, a NYSE-listed health insurance company.

- Senior Principal and Operating Partner (May 2018 to March 2020)

**Optum Analytics**, a division of UnitedHealth Group, a NYSE-listed health insurance company.

- Chief Product Officer (March 2016 to May 2018)
- Vice President, Client Management and Operations (Mach 2014 to March 2016)

Bachelor of Arts from Harvard College

Master of Business Administration from the University of Chicago Booth School of Business

**Defendant Asher**

24.    Defendant Asher served as the Company's CFO since May 2021.

25.    According to the 2025 Proxy Statement, Defendant Asher received $11,182,412 in total compensation for the 2024 Fiscal Year. This included $1,025,000 in salary, $7,179,353 in stock awards, $2,779,925 in non-equity incentive plan compensation, and $198,134 in all other compensation.

26.    The 2025 Proxy Statement stated the following about Defendant Asher:

Mr. Asher has served as our Chief Financial Officer since May 2021. From January 2020 to May 2021, he served as Executive Vice President, Specialty. Prior to joining Centene, he served as the Chief Financial Officer of WellCare from November 2014 to January 2020.

**Defendant Blume**

27.    Defendant Blume has served as a Company's director since February 2018. She also serves as the Chair of the Governance Committee, and as a member of the Audit and Compliance Committee (the "Audit Committee").

28.    The 2025 Proxy Statement stated the following about Defendant Blume:

EXPERIENCE:

**Deloitte LLP,** a leading PCAOB registered public accounting firm.

- Vice Chairman (2012 to 2015)
- Partner (1989 to 2015)

Prior to Deloitte, she served as Chief Financial Officer for one of the largest US local governments.

Bachelor of Science from the University of Central Florida

Former CPA

**Defendant Burdick**

29.     Defendant Burdick has served as a Company director since January 2022. He also serves as the Chair of the Quality Committee.  Defendant Burdick also served as Executive Vice President of Markets and Products for the Company from 2020 to 2021.

30.     The 2025 Proxy Statement stated the following about Defendant Burdick:

EXPERIENCE:

**LifeStance Health, Inc.**, a Nasdaq-listed public company specializing in outpatient mental healthcare.

- Executive Chairman (2025 to present)
- Chief Executive Officer and Chairman (2022 to 2025)

**Centene Corporation**

- Executive Vice President of Markets and Products (2020 to 2021)

**WellCare Health Plans, Inc.**, a NYSE-listed public company providing government-sponsored healthcare programs.

- Chief Executive Officer and Director (2015 to 2020)
- Other positions of increasing responsibility, including President and Chief Operating Officer (2014 to 2015)

**Blue Cross and Blue Shield of** Minnesota, commercial health insurance plans.

- President and Chief Executive Officer and Director (2012)

**Coventry Health Care, Inc.,** a NYSE-listed public company providing government-sponsored healthcare programs.

- Chief Executive Officer of the Medicaid and Behavioral Health businesses (2010 to 2012)

**UnitedHealth Group, Inc.,** a NYSE-listed public company health insurer**.**

- Chief Executive Officer of Secured Horizons (Medicare division of UnitedHealthcare) (2008 to 2009)

- Other positions of increasing responsibility, including Chief Executive Officer of UnitedHealthcare (1995 to 2008)

Bachelor of Arts from Amherst College

Juris Doctorate from the University of Connecticut

**Defendant Coughlin**

31.    Defendant Coughlin served as a Company director since January 2022. He also serves as the Chair of the Compensation and Talent Committee and as a member of the Audit Committee.

32.    The 2025 Proxy Statement stated the following about Defendant Coughlin:

EXPERIENCE:

**Tyco International Ltd**., a NYSE-listed public manufacturing, healthcare and security systems company.

- Senior Advisor to the Chief Executive Officer and member of Board of Directors (2010 to 2012)
- Executive Vice President and Chief Financial Officer (2005 to 2010)

**Interpublic Group of Companies**, a NYSE-listed public multimedia company.

- Chief Operating Officer (2003 to 2004)
- Chief Financial Officer (2003 to 2004)

**Pharmacia Corporation**, a NYSE-listed public pharmaceuticals company.

- Executive Vice President and Chief Financial Officer (1998 to 2003)

Received a Bachelor of Science from Boston College

**Defendant Dallas**

33.    Defendant Dallas has served as a Company director since January 2020. He also serves as a member of the Quality Committee and the Audit Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Dallas:

EXPERIENCE:

**Independent Consultant**

- Focusing on change management, information technology strategy and risk (2013 to present)

**Medtronic Plc,** a NYSE-listed global media technology company.

- Senior Vice President of Quality and Operations (2011 to 2013)
- Senior Vice President and Chief Information Officer (2006 to 2011)

**Georgia-Pacific Corporation,** a NYSE-listed public company which manufactures tissue, pulp, paper, packaging, building products and related chemicals**.**

- Vice President and Chief Information Officer (2002 to 2006)
- President, Lumber Division and other roles of increasing responsibility (1984 to 2002)

Bachelor of Science from the University of South Carolina – Aiken

Master of Business Administration from Emory University

### **Defendant DeVeydt**

35.     Defendant DeVeydt served as a Company director from January 2022 to August 2025. While on the board, he served as the Chair of the Audit Committee and as a member of the Governance Committee.

36.     The Company's 2025 Proxy Statement stated the following about Defendant DeVeydt:

EXPERIENCE:

**Bain Capital, LP,** a private investment firm.

- Managing Director (2022 to present)
- Senior Advisor to the Global Healthcare Division (2017 to 2018)

**Surgery Partners, Inc.,** a Nasdaq-listed health care provider.

- Executive Chairman of the Board of Directors (2020 to present)
- Chief Executive Officer and Director (2018 to 2020)

**Elevance Health, Inc.,** a NYSE-listed public healthcare insurance company (previously known as Anthem).

- Executive Vice President and Chief Financial Officer (2007 to 2016)
- Other positions of increasing responsibility, including Chief Strategy Officer, Chief Accounting Officer and Chief of Staff to the Chairman and Chief Executive Officer (2005 to 2007)

**PriceWaterhouseCoopers LLP,** a leading PCAOB registered public accounting firm.

- Partner (2000 to 2005)
- Other positions of increasing responsibility (1993 to 2000)

Bachelor of Science in Accounting from the University of Missouri

### **Defendant Eppinger**

37.    Defendant Eppinger has served as a Company director since April 2006. He also serves as the Chairman of the Board. Additionally, Defendant Eppinger serves as a member of the Quality Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Eppinger:

EXPERIENCE:

**Stewart Information Services Company**, a NYSE-listed global real estate services and title insurance company.

- Chief Executive Officer (2019 to present)
- Director (2016 to present)

**The Hanover Insurance Group,** a NYSE-listed property and casualty insurance company.

- Executive Vice President of Property and Casualty Field and Service Operations (2001 to 2003)

**Channel Point,** a business-to-business technology firm for insurance companies.

- Executive Vice President of Industry Services, Marketing and Service Operations (2000 to 2001)

**McKinsey & Co.,** a global management consultancy firm.

- Senior Director and Partner (1985 to 2000)

**Coopers & Lybrand,** an accounting firm

- Accountant

Bachelor of Arts from the College of the Holy Cross

Master of Business Administration from the Tuck School of Business Administration at Dartmouth College

**<u>Defendant Ford</u>**

39.    Defendant Ford has served as a Company director since November 2022. He also serves as a member of the Quality Committee and as a member of the Compensation and Talent Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Ford:

EXPERIENCE:

**CIO Strategy Exchange (CIOSE),** a leading cross-industry consortium of Chief Information Officers from many of the world's largest companies.

- Principal Partner (2015 to present)

**Aptean Inc.,** an ERP software and technology company.

- Chief Executive Officer (2012 to 2013)

**American Airlines, Inc.,** a NYSE-listed public airline company.

- Chief Information Officer (2000 to 2012)

**Associates First Capital,** a financial services company.

- President, Associates Services Corporation (1997 to 2000)

- Chief Information Officer (1994 to 2000)

**Bank of Boston,** a regional bank.

- Senior Vice President (1990 to 1994)

**Digital Equipment Corporation,** a NYSE-listed public computer manufacturer.

- Various senior sales, marketing and technology positions (1982 to 1990)

Bachelor of Science from Northeastern University

### Defendant Greco

41.    Defendant Greco has served as a Company director since August 2024. He serves as a member of the Compensation and Talent Committee and the Governance Committee.

42.    The 2025 Proxy Statement stated the following about Defendant Greco:

EXPERIENCE:

**Advance Auto Parts, Inc.,** a NYSE-listed American automotive parts retailer.

- President and Chief Executive Officer (2016 to 2023)

**PepsiCo, Inc.,** a NYSE-listed globally distributed food and beverage company.

- Chief Executive Officer, Frito Lay North America (2011 to 2016)
- Sales and marketing positions of increasing responsibility, including Executive Vice President and Chief Commercial Officer of Pepsi Beverages Company (1986 to 2011)

**The Procter & Gamble Company,** a NYSE listed multinational consumer goods corporation.

- Entry-level sales and marketing positions of increasing responsibility (1981 to 1986)

Bachelor of Commerce from Laurentian University in Sudbury, Ontario

Masters of Business Administration from Richard Ivey School of Business in London, Ontario

### Defendant Samuels

43.     Defendant Samuels has served as a Company director since January 2022. He also serves as a member of the Compensation and Talent Committee and the Quality Committee.

44.     The 2025 Proxy Statement stated the following about Defendant Samuels:

EXPERIENCE:

**Capital Guardian Trust Company**, part of the Capital Group, an investment manager.

- President (2010 to 2017)
- Investor and Global Equity Portfolio Manager (1981 to 2016)
- Capital Group Finance Committee (2013 to 2016)
- Capital Group Board (2005 to 2009)
- Numerous Investment and Management Committees (1981 to 2017)

Bachelor of Arts from Harvard College

Master of Business Administration from Harvard Business School

**Defendant Tanji**

45.     Defendant Tanji has served as a Company director since February 2025. He also serves as a member of the Audit Committee.

46.     The 2025 Proxy Statement stated the following about Defendant Tanji:

EXPERIENCE:

**Prudential Financial, Inc.,** a NYSE-listed international financial services firm.

- Executive Vice President and Chief Financial Officer (2018 to 2024)
- Senior Vice President and Treasurer (2013 to 2018)
- Chief Financial Officer, International Insurance (2010 to 2013)
- Chief Financial Officer, Prudential Annuities (2006 to 2010)
- Chief Financial Officer, Prudential Investment Management (2004 to 2006)
- Vice President of Finance, Investment Division (2002 to 2004)
- Senior Vice President, Prudential Securities (1994 to 2002)

- Various roles of increasing importance, including healthcare insurance (1988 to 1994)

Bachelor of Arts from Yale University

Master of Business Administration from University of Minnesota

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47.     By reason of their positions as officers and/or directors of Centene and because of their ability to control the business and corporate affairs of Centene, the Individual Defendants owed Centene and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Centene in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Centene and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Centene and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Centene, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Centene, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Centene's Board at all relevant times.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Centene were required to, among other things:

    (a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, Missouri, and the United States, and pursuant to Centene's own Code of Conduct ("Code of Conduct");

       (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (c)    remain informed as to how Centene conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Centene and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Centene's operations would comply with all applicable laws and Centene's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.    Each of the Individual Defendants further owed to Centene and the shareholders the duty of loyalty requiring that each favor Centene's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Centene and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, and directorial positions with Centene, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Centene.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

60. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Centene was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Centene and was at all times acting within the course and scope of such agency.

## CENTENE'S CODE OF CONDUCT

63. The Company's Code of Conduct applies to "all directors, officers, and persons employed by" the Company and its subsidiaries. The Code of Conduct states that it seeks "to

provide guidance on how to conduct business in alignment with Centene's Mission, Values, and Behaviors."

64.    Further, Defendant London stated in a signed prefatory letter to the Code of Conduct, in relevant part: "Our Code of Conduct, approved by our Board of Directors, outlines our Values, expectations, requirements, and places to go for help in any situation, all to ensure we adhere to the highest ethical standards and fulfill the expectations of our government partners, our providers, our members, and one another."

65.    Under the heading, "Leading by Example" the Code of Conduct states:

While every member of our CenTeam is accountable for knowing and following this Code, our People Leaders carry a special responsibility to model our Values and serve as a guide and resource to their teams. To fulfill their responsibilities, leaders should:

- Communicate and demonstrate expectations for ethical behavior by holding themselves and others accountable for their words and actions.
- Ensure employees understand no business result is more important than ethical behavior.
- Talk with employees about the Code and Company policies, laws and regulations that affect their job responsibilities, including timely completion of required training.
- Maintain an open-door policy to support employee questions and concerns.
- Encourage ideas that promote and strengthen compliance.
- Be alert to any situation or action that may be unethical, illegal, or violate this Code and take prompt and appropriate action.
- Create an environment where employees feel comfortable raising questions or concerns and remind employees about Centene's non-retaliation policy.

66.    The Code of Conduct provides, under the heading "Consequences for Failing to Adhere to the Code," in relevant part:

The Company takes adherence to our Code very seriously. Any suspected or identified violations of our Code or applicable laws, regulations, policies, or other requirements must be reported to the Ethics & Compliance Department immediately. All directors, officers, and employees must understand that at Centene, we care how results are obtained, not just that they are obtained.

Individuals who violate this Code may be subject to disciplinary action, up to and including termination of employment. When considering whether disciplinary action is appropriate and, if so, what disciplinary action to take, Centene will consider several potential factors, guided by our Values, to ensure consistent and comparable decision-making.

***

In addition to disciplinary action taken by the Company, an employee who fails to comply with applicable laws, regulations, requirements, or policies may be subject to civil and/or criminal liability.

67.    Under the heading "Code Update and Waivers," the Code of Conduct states the following, in relevant part:

Any exceptions to the Code must be reviewed by your People Leader and, if deemed appropriate, approved by the Chief Risk, Ethics & Compliance Officer. Exceptions for directors or executive officers can only be approved by Centene's Board of Directors and will be disclosed as required.

By understanding these protocols, we ensure clarity and uphold the integrity of our Code. This approach ensures everyone is on the same page and any deviations are managed transparently.

68.    Under the heading "Financial Integrity and Internal Controls," the Code of Conduct states the following, in relevant part:

Our Company operates in a highly regulated environment, and the records of our business practices, including our financial bookkeeping and accounting, claims-related activity, and member and provider interactions, must be accurate, complete, and clear. No matter your role with the Company, you must:

- Ensure any documents you create or modify represent an accurate, complete, and clear record of the facts.

- Exercise diligence in your reviews and avoid "rubberstamping" approvals. You are accountable for any document you review and approve, even if the document did not originate with you.

- Hold yourself and your team members to the highest standard of quality. It is not enough that the accuracy, completeness, and clarity of a record represents our "best effort." The record must be right.

- Comply with all applicable laws, regulations, contractual requirements, and policies regarding the content, format, and submission of Company records.

Even an accurate record may place the Company at risk if the record fails to adhere to applicable technical specifications.

- Seek guidance if you have questions or are unsure what to do. The requirements, particularly with respect to financial reporting, can be complex. Your People Leader, Legal counsel and the Ethics & Compliance and Internal Audit Departments are available to assist you.

69.     Under the heading "Protecting Our Assets and Information," the Code of Conduct

states the following, in relevant part:

One of Centene's greatest strengths is the power of One CenTeam's innovative approach to serving its members. To build on that strength, Centene trusts each of its employees to manage and protect all sensitive business information and property in accordance with law, regulation, contract, and policy.

\*\*\*

Inside Information about Centene

Employees who have access to confidential or non-public information are not permitted to use or share that information for stock trading purposes or other non-business purposes that might result in personal financial benefit or to serve as a "tip" to others.

Using inside information in this manner violates our Code, Centene's policies and the law. "Inside information" is any non-public information that a reasonable investor is likely to consider important in making investment decisions.

70.     Under the heading "Appropriate Use of Company Assets," the Code of Conduct

states the following, in relevant part:

Company assets include business equipment, electronics, office supplies, buildings, data and records, credit cards, and phones. These assets are to be used professionally and productively to conduct our business.

Centene has the right to review, retain, investigate, access, and disclose any use of a Company asset. This includes emails, instant messages, telephone communications, internet activity, electronic attachments, and other information and/or data.

Remember, Centene owns all Company assets and any information stored on the assets. Centene may review those assets at any time in connection with legitimate business needs. Permanent electronic records are created on devices. Exercise care when using a Company account for any personal communication, and advise

friends and family to contact you using your personal phone number or email address rather than through Company accounts.

The contents of Company assets may be disclosed to approved internal resources and/or external resources, such as law enforcement, government officials, and legal counsel, without your knowledge or permission.

71.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law.

## CENTENE'S AUDIT COMMITTEE CHARTER

72.     The Company's Audit and Compliance Committee Charter (the "Audit Committee Charter") states that the role of the Audit Committee is to assist the Board's oversight of:

[T]he integrity of the Company's financial statements; the qualifications and independence of the Company's independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Company's Annual Report on Form 10-K (the "independent auditor"); the performance of the Company's internal audit function and independent auditor; the Company's enterprise risk management framework and the Board's process for overseeing the Company's exposure to risks; the Company's compliance with legal and regulatory requirements; the Company's ethics and compliance programs and the effectiveness of its compliance function, including compliance with its Code of Conduct; and cybersecurity, business continuity, disaster recovery and other risks related to information technology ("IT"). The Committee is also responsible for preparing an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

73.     Per the Audit Committee Charter, under the heading "Committee Authority and Responsibilities," the Audit Committee Charter outlines the Audit Committee's general responsibilities, in relevant part:

> The Committee shall have the following authority and responsibilities, together with any additional authority or responsibilities delegated to the Committee by the Board from time to time:
>
> 1. <u>General</u>. The Committee shall discharge its responsibilities and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audits, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles ("GAAP") or applicable law, or to guarantee the independent auditor's reports.

74.     Under the same heading, in the subsection entitled "Review of Other Financial Disclosures," the Audit Committee Charter outlines, in relevant part:

> a. *Quarterly Financial Statements*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The independent auditor shall discuss promptly with the Committee and the Chief Financial Officer any matters identified in connection with the independent auditor's review of quarterly financial information which are required to be discussed by applicable auditing standards.
>
> b. *Earnings Release and Other Financial Information*. The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information, as well as financial

information and earnings guidance provided to analysts, rating agencies and others.

75.    Under the same heading, in the subsection titled "Controls and Procedures," the

Audit Committee Charter also states, in relevant part:

a. *Oversight.* The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

b. *Oversight of Internal Audit Function.* The Committee shall assist the Board in overseeing the performance of the Company's internal audit function, including the following:

- Review the reporting relationship of the internal audit function and periodically meet separately with the Company's Chief Internal Auditor.

- Review and approve the internal audit function's plan, budget and activities for the upcoming fiscal year and evaluate the internal audit function's responsibilities and staffing.

- Review the status of any existing or newly identified significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting on a quarterly basis.

76.    Under the same heading, in the subsection titled "Risk Management," the Audit

Committee Charter also states, in relevant part:

a. The Committee shall review the Company's enterprise risk management reporting processes designed to assist the Board in its oversight of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies.

b. The Committee shall oversee the monitoring of risk exposures and the effectiveness of the enterprise risk management framework.

c. The Committee shall meet periodically with management to review the Company's significant financial, regulatory, reputational or other risk exposures, and the steps management has taken to identify, monitor, assess and control or avoid such exposures.

77.    Under the same heading, in the subsection titled "Ethics & Compliance Program,"

the Audit Committee Charter also states, in relevant part:

a.  The Committee shall oversee matters related to the Company's compliance with laws and regulations, including those concerning fraud, waste and abuse and federal and state healthcare program requirements. This oversight responsibility shall include inquiries from, and audits, investigations and surveys by, federal and state regulatory and enforcement agencies and related legal and administrative proceedings.

b.  The Committee shall oversee the Company's Ethics & Compliance Program (the "Program"), including the performance of the Chief Risk, Ethics & Compliance Officer, and shall review and concur in the appointment, promotion or dismissal of the Chief Risk, Ethics & Compliance Officer, who has direct reporting authority to the Board. In fulfilling this responsibility, the Committee shall consider, among other things, the relevant expectations and requirements of federal and state regulatory and enforcement agencies.

c.  At least annually, the Committee shall review the design, dedicated resources and operational effectiveness of the Program. In connection with this assessment, the Committee shall obtain and consider reports by the internal audit department as it deems appropriate. If the Committee determines that it is necessary to retain one or more external experts to assist the Committee with the evaluation, it shall do so.

d.  The Committee shall oversee, and periodically review, the process that the Company has developed for identifying, assessing, prioritizing and mitigating legal, regulatory and compliance risks.

e.  The Committee shall annually review, and approve, the compliance audit, testing and monitoring plan developed by management.

78.     The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's

risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.    Centene is a Delaware corporation headquartered in St. Louis, Missouri. Centene presents itself as a leading healthcare enterprise dedicated to improving health outcomes. It purports to employ a localized approach, utilizing regional brands and teams, to deliver fully integrated, high-quality, and cost-effective healthcare services, particularly through government-sponsored and commercial programs.

80.    Centene emphasizes its focus on serving underinsured and uninsured populations and claims to provide affordable, quality healthcare coverage to more than one in fifteen individuals across the United States, including Medicaid and Medicare beneficiaries, as well as individuals and families enrolled through the Health Insurance Marketplace.

81.    In 2024, Centene operated through four primary business segments: Medicaid, Medicare, Commercial, and Other.

82.    The Medicaid segment encompasses a range of government-sponsored programs, including the Temporary Assistance for Needy Families ("TANF") program, Medicaid Expansion initiatives, the Aged, Blind, or Disabled ("ABD") program, the Children's Health Insurance Program ("CHIP"), Long-Term Services and Supports ("LTSS"), Foster Care, and Medicare-Medicaid Plans ("MMP"), which serve individuals eligible for both Medicaid and Medicare. It also included other state-administered healthcare programs.

83.    The Medicare segment includes offerings such as Medicare Advantage plans, Medicare Supplement insurance, Dual Eligible Special Needs Plans ("D-SNPs"), and Medicare Prescription Drug Plans ("PDPs"), also known as Medicare Part D.

84.    The Commercial segment involves the provision of health insurance products through the Health Insurance Marketplace, as well as coverage options for individual consumers and small and large employer groups.

85.    Finally, the Other segment comprises Centene's pharmacy operations; Envolve Benefit Options' dental and vision services; clinical healthcare and behavioral health services; participation in the TRICARE program; and various corporate management functions.

**False and Misleading Statements**

***December 12, 2024 Press Release and Analyst/Investor Day***

86.    The Relevant Period began on December 12, 2024 when the Company issued a press release announcing its financial guidance for 2025 (the "December 2024 Press Release"). In the December 2024 Press Release, Defendant London stated, in relevant part:

> Centene is a mission-driven organization, dedicated to delivering high quality outcomes for more than 28 million members, many of whom are among the nation's most medically complex and historically underserved populations. Over the last three years we improved our core operations and invested in the experience of our customers and providers, all while delivering on our financial commitments. This morning, we are reiterating our 2024 adjusted diluted EPS guidance of greater than $6.80. Additionally, we issued 2025 adjusted diluted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth.

87.    On that same day, the Company hosted an Analyst/Investor Day to provide details of the 2025 financial guidance (the "Analyst/Investor Day"). At the Analyst/Investor Day, Defendant Asher represented, in relevant part:

> Let's start with the basics. Stability in earnings power in the face of unprecedented headwinds provide Centene with a solid jump off point for 2025 and beyond. As you've likely seen by now, we've issued 2025 adjusted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth compared to this year's

current outlook. We are using today as an opportunity to set the floor for 2025 guidance, inclusive of an expectation for a 3% to 4% Medicaid composite rate adjustment.

*    *    *

Now let's move to why you joined us today: the future. Starting with the first ingredient you need to drive earnings growth: revenue growth. ***We are expecting 7.6% growth at the midpoints, $11 billion of additional premium revenue compared to 2024 for a 2025 guidance midpoint of $155 billion of premium and service revenue.***[1]

*    *    *

What does all of this add up to? Initial 2025 adjusted diluted EPS guidance of greater than $7.25. You can see 2025 guidance elements summarized here, including our first year with a diluted share count starting with a 4. Note also an adjusted effective tax rate of 22% to 23%, which is down a little from 2024, primarily driven by a state tax benefit expected to be realized in Q4 of 2025.

### *February 4, 2025 4Q24 Press Release and Earnings Call*

88.    On February 4, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024 (the "4Q/FY24 Press Release"). The 4Q/FY24 Press Release contained the Company's 2025 financial guidance, which included, in relevant part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $4.0 billion to a range of $158.0 billion to $160.0 billion to reflect the following expectations:

- outperformance in our PDP annual enrollment resulting in an additional $1.5 billion premium revenue,
- outperformance in our Medicare Advantage annual enrollment resulting in $1.0 billion of additional premium revenue, and
- $1.5 billion of additional Medicaid premium revenue due to a program change adding behavioral health coverage in one of our state contracts.

---

[1] All emphasis herein is added unless stated otherwise.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

89.     That same day, the Company hosted an earnings call with analysts and investors to discuss its financial results for the fourth quarter and full year 2024 (the "4Q/FY24 Earnings Call").

90.     During the 4Q/FY24 Earnings Call, Defendant London detailed the Company's increased 2025 guidance, stating, in pertinent part:

> Strong results that demonstrate the durability of our earnings power and position the company to execute against our strategic goals in 2025. ***Driven by better-than-expected results during the Medicare annual enrollment period and a program expansion in Medicaid, we are lifting our full year 2025 revenue guidance by $4 billion.***
>
> Our outlook for full year 2025 adjusted diluted EPS remains unchanged at greater than $7.25, and we are pleased with the trajectory we are on at this early stage in the year. To that end, let's talk about the opportunities in each of our business lines and how we are positioned for 2025.

91.     Also during the 4Q/FY24 Earnings Call, Defendant Asher reaffirmed the Company's decision to increase the 2025 guidance, stating, in relevant part:

> So we are increasing our consolidated 2025 premium and service revenue guidance range by $4 billion to a range of $158 billion to $160 billion of premium and service revenue. This is good news as you think about the long-term earnings power of Centene. At this very early point in the year, we are reiterating our 2025 adjusted diluted EPS guidance floor of greater than $7.25. Quick comment on 2026 Medicare rates. The preliminary percentage rate change for us is in the low to mid-3s, including the positive impact of STARS from the work we did in 2023 and 2024.

***March 27, 2025 Proxy Statement***

92.     On March 27, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

93.     The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Klynveld Peat Marwick Goerdeler ("KPMG") as the Company's independent registered public accounting firm for 2025; and (4) approve the Company's 2025 Stock Incentive Plan (the "Incentive Plan").

94.     The 2025 Proxy Statement explains that the Incentive Plan would increase the aggregate number of shares authorized for issuance under the existing plan to 15,000,000 shares. As of March 15, 2025, there were 6,202,973 shares available to grant to employees under the Company's Prior Plans. As such, following the approval of the Incentive Plan, there would be a total of 15,000,000 shares available. The 2025 Proxy Statement noted that if the Centene shareholders approved the Incentive Plan, "employees, officers, directors, consultants and advisors are eligible to receive awards under the Plan." The Incentive Plan would be administered by the Compensation and Talent Committee if approved, which includes Defendants Coughlin (as Chair), Ford, Greco, and Samuels. Further, the 2025 Proxy Statement notes that the Incentive Plan "grants [] restricted stock units, stock options, stock appreciation rights, restricted stock, and any other stock-based awards that have values based on the values of shares, including but not limited to grants of stock and grants of rights to receive stock in the future."

95.     Regarding the Board's role in "Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> The Board has overall responsibility for the oversight of enterprise-wide risk management at Centene, while management is responsible for day-to-day risk management. The Board implements its risk oversight function both as a whole and through its committees. Each Board committee oversees risks associated with its respective principal areas of focus and then reports to the Board. These areas of focus include competitive, economic, operational, financial (including accounting,

credit, liquidity and tax), legal, regulatory, compliance, political, strategic, reputational and other risks.

The oversight responsibility of the Board and its committees is assisted by management reporting processes designed to provide visibility to the Board of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies. The Company's process for the evaluation of risk is based on a blend of principles associated with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) enterprise risk management framework, *Enterprise Risk Management – Integrating with Strategy and Performance* and *ISO 31000: 2018 Risk Management*. The primary goals of the enterprise risk management program are to enhance management's ability to identify and assess the Company's current risk status, gain insights on emerging risks, improve management's strategic and operational decision-making ability and provide clear and timely communication of cross-functional risks to management and the Board. The enterprise risk management process is facilitated by the Company's Risk Management department. An enterprise risk management committee comprised of senior leaders within the Company meets at least four times per year to discuss the most significant risks to the Company identified by the Company's enterprise risk management process and the steps management has taken to identify, monitor, assess and control or avoid such exposures. The enterprise risk management committee also reviews performance measures against the company's risk appetite and tolerance and provides recommendation(s) of corrective action, where appropriate. The enterprise risk management process is an active process and is continually enhanced and updated.

The Company's Risk Management department provides an enterprise risk management report to the full Board at least four times per year. Each Board committee reports to the Board any significant issues relating to their relevant risk areas.

96.     Regarding the Company's Code of Conduct, the 2025 Proxy Statement provides:

The Company has published on its website (www.centene.com) its Code of Conduct, which applies to all officers, employees and directors. Any waiver of, or amendments to, the Code of Conduct for directors or executive officers, including the chief executive officer, the chief financial officer and the principal accounting officer, must be approved by the Governance Committee, and any such waivers or amendments will be disclosed within four business days by the Company by posting such waivers or amendments to its website. Both the Audit and Compliance Committee and the Governance Committee review management's monitoring of compliance with the Company's Code of Conduct.

97.     Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford,

Greco, Samuels, and Tanji caused the 2025 Proxy Statement to be false and misleading by failing

to disclose, *inter alia*, that: (1) public representations about the Company's financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (2) the Company's enrollment figures were materially overstated and  morbidity trends were misrepresented across Centene's business segments, especially in the Medicare segment; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

98.     The 2025 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

99.     As a result of Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji causing the 2025 Proxy Statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board, thereby allowing them to continue breaching their duties to the Company; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of KPMG as the Company's independent registered public accounting firm for 2025; and (4) approve the Incentive Plan.

100.    As a result of the shareholders approving the Incentive Plan, an aggregate number of 15,000,000 shares were authorized for disbursement. As such, the Individual Defendants are able to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Incentive Plan in the future.

*April 25, 2025 1Q25 Press Release and Earnings Call*

101.    On April 25, 2025, Centene issued a press release announcing its financial results for the first quarter 2025 (the "1Q25 Press Release"). The 1Q25 Press Release also included an increased guidance for 2025. Defendant London stated, in relevant part:

> Our first quarter results demonstrate the resiliency of Centene's platform and the progress we are making as an organization while navigating a dynamic policy landscape. ***We are pleased to reiterate our full year 2025 adjusted diluted earnings per share outlook of greater than $7.25 and continue to see attractive opportunities to grow from the strength of our core businesses in the years to come.***

102.    The 1Q25 Press Release also provided an updated guidance for the fiscal year ended December 31, 2025 (the "2025 Fiscal Year"), stating, in pertinent part:

> **Outlook**
>
> The Company is increasing its 2025 premium and service revenues guidance range by $6.0 billion to a range of $164.0 billion to $166.0 billion to reflect the following expectations:
>
> - $5.0 billion of additional Marketplace premium revenue due to outperformance in enrollment throughout the first quarter; and
> - outperformance in the Medicare Advantage annual enrollment period resulting in $1.0 billion of additional premium revenue.
>
> The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.
>
> The Company's annual guidance for 2025 is as follows and will be discussed further on our conference call:

|  | **Full Year 2025** |
| --- | --- |
| GAAP diluted EPS | > $6.19 |
| Adjusted diluted EPS (1) | >$7.25 |

1) A full reconciliation of adjusted diluted EPS is shown in the Non-GAAP Financial Presentation section of this release.

|  | **Full Year 2025** | |
| --- | --- | --- |
|  | **Low** | **High** |
| Total revenues (in billions) | $   178.5 | $   181.5 |
| Premium and service revenues (in billions) | $   164.0 | $   166.0 |
| HBR | 88.9 % | 89.5 % |
| SG&A expense ratio | 7.7 % | 8.2 % |
| Adjusted SG&A expense ratio (2) | 7.7 % | 8.2 % |
| Cost of services expense ratio | 88.2 % | 88.8 % |
| Effective tax rate | 21.5 % | 22.5 % |
| Adjusted effective tax rate (3) | 22.0 % | 23.0 % |
| Diluted shares outstanding (in millions) | 491.0 | 494.0 |

2) Represents a non-GAAP financial measure. Adjusted SG&A expense ratio excludes acquisition and divestiture related expenses of approximately $550 thousand.

3) Represents a non-GAAP financial measure. Adjusted effective tax rate excludes income tax effects of adjustments of approximately $165 million to $168 million.

103.    That same day, the Company held an earnings call with analysts and investors to discuss its first quarter financial results for the 2025 Fiscal Year as well as the updated 2025 guidance (the "1Q25 Earnings Call").

104.    During the 1Q25 Earnings Call, Defendant Asher represented, in relevant part:

*On our entire Medicaid book, we are projecting a full year composite rate increase at 4% plus.*

*Medicare Advantage and PDP both outperformed on membership. We retained more membership than expected during the Medicare Advantage open*

*enrollment period, which bodes well for long-term earnings power. This is contributing $1 billion to our 2025 premium and service revenue guidance increase. PDP ended the quarter at 7.9 million members, strong growth from 2024.*

Medicare segment HBR was 86.3% in the quarter, which, as we covered in past discussions, is expected to follow an inverted slope line compared to 2024 due to the Inflation Reduction Act program changes. So a lower Medicare segment HBR and higher earnings early in the year and a higher HBR and lower earnings later in the year.

Within the Medicare segment, both Medicare Advantage and PDP businesses were on track in the quarter. And you'll see an intra-year increase in the Medicare Advantage PDR, premium deficiency reserve, that was planned for and is solely related to the sloping of earnings during 2025. So no change in our view of Medicare Advantage earnings for 2025.

Commercial membership was very strong in the quarter, not just during open enrollment for 1/1, but also in February and March. Q1 Commercial segment HBR at 75.0% was a little higher than last year's 73.3%, driven by 1.9 million new Marketplace Members in Q1. These members are utilizing a little more than last year's new members. But because it's so early in the year, we are not yet recognizing a matching offset for risk adjustment. We'll know more when we get the first Wakely file in late June, early July.

*Given top line performance in Q1, and even as we forecast net membership attrition throughout the rest of the year, we are adding $5 billion of premium revenue to 2025 guidance related to Marketplace.*

\*      \*      \*

*Looking at the full year, we are pleased to reiterate greater than $7.25 of adjusted diluted EPS. As you've heard, the theme of the quarter was strong premium revenue growth and stronger-than-expected membership. Accordingly, we are increasing premium and service revenue guidance to a midpoint of $165 billion, up from $159 billion.*

105.    During the question-and-answer portion of the 1Q25 Earnings Call, both Defendants London and Asher took on questions from analysts. In relevant part, this segment of the 1Q25 Earnings Call proceeded as follows, in pertinent part:

<Q: Ann Kathleen Hynes - Mizuho Securities USA LLC – Analyst> I know you gave original guidance from Medicaid rates in the second half. You assumed, I

believe, around the 2.5% rate increase. Is that still the case? And do you have increased visibility on how those negotiations are going for the second half? That would be my first question.

And then maybe secondly, with Medicaid besides the flu, is anything running harder than you expected when you -- versus when you gave original guidance?

<A: Defendant London> Thanks, Ann, for the question. So composite rate for the full year, we're now seeing at mid-4s, and the rate negotiations relative to upcoming, so think about the 7/1 cohort, which is the next cycle, we will start to get visibility into that as we get in -- later into Q2. So more to come on that front. But as you heard me say, I think we're seeing good continued momentum in our discussions with state partners. And the fact that as we roll forward, we have further completion data behind us in terms of the acuity patterns that started to emerge in Q2 right around this time last year. So that helps bolster the conversation in terms of supporting the actuarial calculus, and I think helps in conversations with the state. So obviously, looking to that 7/1, 9/1 and 10/1 cohort to contribute to the back half of the year.

And then I think you asked about Medicaid utilization beyond flu. And so we continue to see largely the same themes. But Drew, maybe you want to click into a few of those.

<A: Defendant Asher> Yes. No, clearly, we had the flow of $130 million in Q1. That's transitory. Behavioral health continues to be a trend item. We've mentioned that probably for the last 6 quarters. We've got initiatives to tackle that and working with our state partners, things like applied behavioral analysis. I guess, no surprise coming out of the pandemic era. There's pockets of home health. We've mentioned that before, things like attended services that where we can tighten UM, do some audits. And then probably the area of uptick is high-cost drugs. An example might be Elevidys, which curiously is a $3.2 million single-treatment drug that if you read the JAMA articles, it's questionable in terms of the efficacy. And looking at -- we're all trying to keep health care affordable. That seems quite extreme for a cost of a single treatment for a newly approved drug last year. So that's an area of uptick that effectively is on the back of the federal and state governments and us as a payer.

So that's one thing we're watching, and we thought about that as we lifted the Medicaid HBR into the mid- to high 90-ones from our previous guidance.

*      *      *

<Q: Hua Ha – Robert W. Baird & Co. – Analyst> Regarding the exchanges. So firstly, I'm having a little bit of trouble bridging to your expected $5 billion of additional revenue. If I take your roughly 0.5 million more lives, 550 revenue PMPM, I'm still getting to only about $3 billion to $4 billion. And I know you're

still assuming the same in your attrition cadence. So I was wondering if you could help me bridge that gap in case I'm missing something.

And then I understand you're treating incremental exchange growth in 1Q to be lower margins. It sounds like you could be conservatism, but wondering what exact margin level you're assuming on those lives. And lastly, very quickly, when you hear the most bearish concerns about the magnitude of potentially millions of fraudulent lives and the exchanges and the risk that might pose to you next year. I'm just curious to hear your general thoughts overall level of confidence that this most bear-case scenario that's rolling around won't actually happen.

<A: Defendant London> Yes. Thanks for the question. So let me start with the last piece of that and we can sort of work our way backwards. There's obviously been a lot of concern about the idea that there is sort of ramp in broker fraud or ghost members in the population, I think it's important to note that the movement to drive additional program integrity, which was understandably loosened during the pandemic, started more than a year ago and a lot of the program integrity measures that are being put in place are things that we've operated with in the past, which means we have baseline and benchmark data around what some of these rates should be.

We were a pioneer in terms of implementing the agent of record lock. Back in January of last year we introduced that. We were the first to put it in place. And we're seeing the benefit of that. And we track very closely the levels of complaints that come in from members or where there are broker issues throughout the year and can understand whether we're seeing upticks in that and anything different than what we would expect.

So I think we have accounted for things like the failure to reconcile in our full year outlook. Again, the timing of that has shifted. But the team is pretty experienced at understanding the dynamics in the membership. Obviously, the new utilizers that we have where we're seeing utilization is frankly a good sign because it's hard for ghosts to utilize the system. And we feel like we have all the data we need to account for what -- how this will play out both through the remainder of this year and in 2026.

I think you asked about sort of the level of margin for the new member cohort. Overall, we still expect to be in the 5% to 7.5% margin range for Marketplace. And as I said, we've encountered for a continuation of the level of utilization we're seeing in that new member base. In the full year outlook, our renewal members are as expected.

And then...

<A: Defendant Asher> Yes, then on your first question, the -- so we put up $10.1 billion of commercial premium in Q1. And if you do the math on our guidance, it's

$39 billion for the full year. So we are accounting for attrition throughout the rest of the year to end up in the high 4s. So that sort of hangs together.

106.    The statements referenced above in ¶¶ 86-91, 101-105 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) public representations about the Company's financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (2) the Company's enrollment figures were materially overstated and  morbidity trends were misrepresented across Centene's business segments, especially in the Medicare segment; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

107.    The truth emerged on July 1, 2025, when the Company published a press release formally retracting the Company's previously issued GAAP and adjusted diluted EPS guidance for the 2025 Fiscal Year.

108.    The press release provided, in relevant part:

**Marketplace 2025 Risk Adjustment Update**

The Company recently received and analyzed its first view of 2025 industry Health Insurance Marketplace (Marketplace) data from Wakely, an independent actuarial firm, covering 22 of Centene's 29 Marketplace states, and representing approximately 72% of the Company's Marketplace membership. This data is submitted to Wakely by most Marketplace insurance carriers.

Based upon the Company's preliminary interpretation of the data and discussions with Wakely, the overall market growth in the 22 states is lower than expected and the implied aggregate market morbidity in those states is significantly higher than, and materially inconsistent with, the Company's assumptions for risk adjustment revenue transfer used in the preparation of its previous 2025 consolidated guidance.

***The Company's preliminary analysis of the 22 states results in a reduction to its***

*previous full year net risk adjustment revenue transfer expectation by a preliminary estimate of approximately $1.8 billion which corresponds to an adjusted diluted EPS impact of approximately $2.75. This preliminary estimate includes a projection of the remaining eight months of 2025 and is based on 2025 paid claims through April 30 from Wakely for the 22 states, as well as the Company's membership estimates and morbidity trend estimates for both its members and the aggregate market, calculated by state.*

The Company does not have information or estimates for its remaining seven Marketplace states, but anticipates, due to the morbidity trends observed in the 22 states, an additional reduction to its net risk adjustment revenue transfer expectation with a corresponding adjusted diluted EPS impact.

Regarding the 2026 Marketplace plan year, the Company has commenced the process of refiling 2026 Marketplace rates to reflect a higher projected baseline of Marketplace morbidity than previously expected. The Company currently expects to be able to take corrective pricing actions for 2026 in states representing a substantial majority of its Marketplace membership.

109.    On this news, the price of the Company's stock fell $22.87 per share, or 40.4%, from a closing price of $56.65 per share on July 1, 2025, to close at $33.78 per share on July 2, 2025.

110.    Following Centene's disclosure, several prominent analysts revised their price targets downward. Notably, on July 2, 2025, Barclays cut its target by approximately 31%, lowering it from $65 to $45 in a report entitled "CNC Withdraws 2025 Guidance In Early Sign of ACA Marketplace Spiral."

### Subsequent Developments

111.    Similarly, CFRA reduced its price target from $48 to $37 and warned, in relevant part:

We cut our 2025 EPS view to $4.55 from $7.30 and keep 2026's at $7.91. CNC withdrew its 2025 guidance after reviewing new actuarial data that covers ~72% of CNC's Marketplace membership across 22 states. Centene now expects overall market growth to be lower and implied aggregate market morbidity in these states is significantly higher than CNC's assumptions for risk adjustment revenue transfer used in its previous guidance. From these 22 states, CNC sees a disconnect of $1.8B, which corresponds to an adj. EPS impact of $2.75. We note CNC has a

marketplace business in 29 states total, and anticipate the remaining seven states will show similar morbidity trends. This could reduce CNC's net risk adjustment revenue transfer expectations, and therefore EPS expectations, further.

112.    In the same vein, Guggenheim characterized Centene's developments as a "tough update," stating in relevant part:

> Centene withdrew its 2025 guidance following a material anticipated HIX risk adjustment revenue shortfall and higher Medicaid cost trend, although favorable MA/PDP performance and likely SG&A cuts partially offset. Our back-of-the-envelope math suggests a $2.50-$3.00 EPS range for 2025 now (vs. previous guidance $7.25+), contemplating estimated negative impacts of ~$3.80 from HIX risk adjustment and ~ $1.50-$2.00 from Medicaid trend, perhaps offset by a favorable $1+ on MA/PDP upside and SG&A savings. For HIX, CNC noted an ability to potentially partially offset for the vast majority of its HIX book in 2026 via increased pricing, although rate request data we've analyzed so far suggests CNC had already requested mid-to-high teens rate growth for 2026 prior to yesterday's announcement. At issue, however, is how low CNC undershot its risk transfer position vs. competitors, and if this was simply a CNC mismodeling issue or if acuity is significantly higher across the rest of CNC's markets, which could have negative read-throughs to MOH, ELV, and CI in our coverage given relative HIX footprints. Nonetheless, combined with major market exits from competitors, and a lack of enhanced HIX subsidy extension already putting pressure on HIX risk pools, the announcement underpins even greater uncertainty around the HIX market for 2026. Additionally, continued cost trend pressures in Medicaid (already flagged by ELV) paint a difficult picture for near-term Medicaid earnings without absolute guarantees that actuarial sound rate catch-ups across states could be obtained in a timely manner. While better-than-expected performance in MA and PDP may provide some offsets, and CNC can look to reprice its HIX book in 2026, the updates leave us incrementally cloudy on the 2026 set-up. Despite a historically low valuation (~6.7x our current 2026E EPS), we are not surprised to see the stock trading down significantly (20%+) post-market on the updates. Maintain NEUTRAL rating.

## REPURCHASES DURING THE RELEVANT PERIOD

113.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spend an aggregate amount of **approximately $412.3 million** to repurchase approximately 7,432,000 shares of its own common stock at artificially inflated prices between December 2024 and May 2025.

114.     According to the Company's annual report on Form 10-K for the 2024 Fiscal Year filed February 18, 2025, between December 1, 2024 and December 31, 2024, the Company purchased 14,000 shares of its common stock at an average price of $59.45 per share , for a total cost to the Company of approximately $832,300.

115.     As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $359,380 for repurchases of its own stock between December 1, 2024 and December 31, 2024.

116.     According to the Company's quarterly report on Form 10-Q for the 2025 Fiscal Year filed April 25, 2025 (the "1Q25 10-Q"), between January 1, 2025 and January 31, 2025, the Company purchased 14,000 shares of its common stock at an average price of $62.70 per share, for a total cost to the Company of approximately $877,800.

117.     As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $404,880 for repurchases of its own stock between January 1, 2025 and January 31, 2025.

118.     According to 1Q25 10-Q, between February 1, 2025 and February 28, 2025, the Company purchased 57,000 shares of its common stock at an average price of $64.65 per share, for a total cost to the Company of approximately $3,685,050.

119.     As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $1,759,590 for repurchases of its own stock between February 1, 2025 and February 28, 2025.

120.     According to the 1Q25 10-Q, between March 1, 2025 and March 31, 2025, the Company purchased 634,000 shares of its common stock at an average price of $58.19 per share, for a total cost to the Company of approximately $36,892,460.

121.    As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $15,475,940 for repurchases of its own stock between March 1, 2025 and March 31, 2025.

122.    According to the Company's quarterly report on Form 10-Q for the 2025 Fiscal Year filed July 25, 2025 (the "2Q25 10-Q"), between April 1, 2025 and April 30, 2025, the Company purchased 1,596,000 shares of its own common stock at an average price of $59.25 per share, for a total cost to the Company of approximately $94,563,000.

123.    As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $40,650,120 for repurchases of its own stock between April 1, 2025 and April 30, 2025.

124.    According to the Company's quarterly report on Form 10-Q for the 2025 Fiscal Year filed July 25, 2025, between May 1, 2025 and May 31, 2025, the Company purchased 5,117,000 shares of its own common stock at an average price of $59.69 per share, for a total cost to the Company of approximately $305,433,730.

125.    As the Company's stock was actually worth only $33.78 per share, the price at closing on July 2, 2025, the Company overpaid by approximately $132,581,470 for repurchases of its own stock between May 1, 2025 and May 31, 2025.

126.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $191,231,380.

### **DAMAGES TO CENTENE**

127.    As a direct and proximate result of the Individual Defendants' conduct, Centene has lost and expended, and will continue to lose and expend, many millions of dollars.

128.    Such losses include approximately $191.2 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

129.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

130.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

131.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

132.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

133.    As a direct and proximate result of the Individual Defendants' conduct, Centene has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

134.    Plaintiff brings this action derivatively and for the benefit of Centene to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Centene, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

135.    Centene is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

136.    Plaintiff is, and has been at all relevant times, a shareholder of Centene. Plaintiff will adequately and fairly represent the interests of Centene in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

137.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

138.    A pre-suit demand on the Board of Centene is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants London, Blume, Burdick, Coughlin, Dallas, Eppinger, Ford, Greco, Samuels, and Tanji (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants who are on the Board at the time this action is commenced.

139.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants

unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

140. As Board members of Centene charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Centene, the Director-Defendants must have been aware of the material facts regarding the Company's enrollment, morbidity rates, and retention rates in the Company's Medicare business.

141. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Centene to issue materially false and misleading statements. Specifically, the Director-Defendants caused Centene to issue false and misleading statements which were intended to make Centene appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused. Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $191.2 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142. Moreover, the Director-Defendants solicited the 2025 Proxy Statement, which called for a shareholder vote to, *inter alia*, re-elect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board, allowing them to continue breaching their fiduciary duties to the Company.

143. In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the Incentive Plan, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Incentive Plan, who would not have approved the Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Incentive Plan at the annual meeting of stockholders of Centene on May 13, 2025, there were 6,202,973 shares available under the then-existing plan. After the shareholders approved the Incentive Plan, 15,000,00 aggregate shares were made available under the plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the Incentive Plan pursuant to the 2025 Proxy Statement. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

144. Additional reasons that demand on Defendant London is futile follow. Defendant London has served as CEO of the Company since March 2022 and as a Company director since September 2021. The Company provides Defendant London with her occupation, for which she receives generous compensation as alleged above. Thus, as the Company admits, she is not an independent director. Moreover, Defendant London solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and

Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As the Company's highest officer, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant London personally made many of the false and misleading statements alleged herein. Additionally, under the Incentive Plan, Defendant London is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. Moreover, Defendant London is a defendant in the Securities Class Action. For these reasons, too, Defendant London breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Blume is futile follow. Defendant Blume has served as a Company director since February 2018. She also serves as the Chair of the Governance Committee and as a member of the Audit Committee. Defendant Blume receives handsome compensation for her role as a director. Moreover, Defendant Blume solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and Defendants London, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, under the Incentive Plan, Defendant Blume is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Blume breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Burdick is futile follow. Defendant Burdick has served as a Company director since January 2022. He also serves as the Chair of the Quality Committee. Defendant Burdick previously worked for the Company as its Executive Vice President of Markets and Products from 2020 to 2021. Thus, as the Company admits, he is not an independent director. Moreover, Defendant Burdick solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, under the Incentive Plan, Defendant Burdick is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Burdick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Coughlin is futile follow. Defendant Coughlin has served as a Company director since January 2022. He also serves as the Chair of the Compensation and Talent Committee and as a member of the Audit Committee. Defendant Coughlin receives handsome compensation for his role as director. Moreover, Defendant Coughlin solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Coughlin is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Burdick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Dallas is futile follow. Defendant Dallas has served as a Company director since January 2020. He also serves as a member of the Quality Committee and the Audit Committee. Defendant Dallas receives handsome compensation for his role as director. Moreover, Defendant Dallas solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Coughlin, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well

as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Dallas is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Dallas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Eppinger is futile follow. Defendant Eppinger has served as a Company director since April 2006. He also serves as a member of the Quality Committee. Defendant Eppinger receives handsome compensation for his role as director. Moreover, Defendant Eppinger solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Eppinger is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Eppinger breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Ford is futile follow. Defendant Ford has served as a Company director since November 2022. He also serves as a member of the Quality Committee and the Compensation and Talent Committee. Defendant Ford receives handsome compensation for his role as a Company director. Moreover, Defendant Ford solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Greco, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Ford is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Greco is futile follow. Defendant Greco has served as a Company director since August 2024. He also serves as a member of the Governance Committee and the Compensation and Talent Committee. Defendant Greco receives handsome compensation for his role as a Company director. Moreover, Defendant Greco solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to

the re-election of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Samuels, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Greco is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Greco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Samuels is futile follow. Defendant Samuels has served as a Company director since January 2022. He also serves as a member of the Quality Committee and the Compensation and Talent Committee. Defendant Samuels receives handsome compensation for his role as a Company director. Moreover, Defendant Samuels solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, and Tanji, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Samuels is eligible to

receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Samuels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Tanji is futile follow. Defendant Tanji has served as a Company director since February 2025. He also serves as a member of the Audit Committee. Defendant Tanji receives handsome compensation for his role as a Company director. Moreover, Defendant Tanji solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, and Samuels, thereby allowing them to continue to breach their fiduciary duties to the Company, as well as the approval of the Incentive Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, under the Incentive Plan, Defendant Tanji is eligible to receive stock awards under the Incentive Plan and will receive stock awards under the Incentive Plan, thereby materially benefiting from the adoption of the Incentive Plan. For these reasons, too, Defendant Tanji breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on the Board is futile follow.

155. Defendants Blume, Coughlin, Dallas, and Tanji (the "Audit Committee Directors") served as members of the Audit Committee at all relevant times. As such, they were responsible

for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Directors breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

156.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

157.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and

conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial

likelihood of liability and demand is futile as to them.

158.    The Director-Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

159.    The acts complained of herein constitute violations of fiduciary duties owed by

Centene's officers and directors, and these acts are incapable of ratification.

160.    The Director-Defendants may also be protected against personal liability for their

acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Centene. If there is a directors' and officers'

liability insurance policy covering the Directors, it may contain provisions that eliminate coverage

for any action brought directly by the Company against the Director-Defendants, known as, *inter

alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue

themselves or certain of the officers of Centene, there would be no directors' and officers'

insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a

suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

161.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Centene to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

162.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

165.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

166.    Under the direction and watch of the Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

167.    The 2025 Proxy Statement also failed to disclose that: (1) public representations about the Company's financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (2) the Company's enrollment figures were materially overstated and  morbidity trends were misrepresented across Centene's business segments, especially in the Medicare segment; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168.    In the exercise of reasonable care, Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the

2025 Proxy Statement including, but not limited to, the re-election of the directors and the approval of the Incentive Plan.

169.    As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to approve the Incentive Plan.

170.    The Company was damaged as a result of the Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Samuels, and Tanji's material misrepresentations and omissions in the 2025 Proxy Statement.

171.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    The Individual Defendants, by virtue of their positions with Centene and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Centene and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and

influence and exercised the same to cause Centene to engage in illegal conduct and practices complained of herein.

174.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Centene. Not only is Centene now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Centene by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 7,432,000 of its own shares at artificially-inflated prices, damaging Centene.

177.    During the Relevant Period, the Individual Defendants also individually and in concert, directly or indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, periodic and current reports filed with the SEC.

178.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Centene not misleading.

179.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Centene.

180.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

181.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Centene's business and affairs.

184.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

185.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Centene.

186.    In breach of their fiduciary duties owed to Centene, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) public representations about the Company's financial guidance and operational stability were based on unreliable assumptions and unsupported projections; (2) the Company's enrollment figures were materially overstated and  morbidity trends were misrepresented across Centene's business segments, especially in the Medicare segment; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

187.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

188.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

189.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

190.     In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed

191.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Centene's securities.

192.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Centene's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

193.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Centene has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.     Plaintiff, on behalf of Centene, has no adequate remedy at law.

### FIFTH CLAIM
**Against Individual Defendants for Unjust Enrichment**

196.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Centene.

198.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Centene that was tied to the performance or artificially inflated valuation of Centene, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

199.     Plaintiff, as a shareholder and a representative of Centene, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

200.     Plaintiff, on behalf of Centene, has no adequate remedy at law.

### SIXTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Centene to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

203.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

204.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

205.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Centene in a manner consistent with the operations of a publicly held corporation.

208.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Centene has sustained and will continue to sustain significant damages.

209.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

210.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Abuse of Control

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Centene, for which they are legally responsible.

213.    As a direct and proximate result of the Individual Defendants' abuse of control, Centene has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants London and Asher for Contribution Under Sections 10(b) and 21D of the Exchange Act

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    Centene and Defendants London and Asher are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants London's and Asher's willful and/or reckless violations of their obligations as officers and/or directors of Centene.

217.    Defendants London and Asher, because of their positions of control and authority as officers and/or directors of Centene, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Centene, including the wrongful acts complained of herein and in the Securities Class Action.

218.    Accordingly, Defendants London and Asher are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

219.    As such, Centene is entitled to receive all appropriate contribution or indemnification from Defendants London and Asher.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Centene, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Centene;

(c)    Determining and awarding to Centene the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Centene and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Centene and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Centene to nominate at least five candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)    Awarding Centene restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 14, 2025

                **THE BROWN LAW FIRM, P.C.**

                */s/Timothy Brown*
                Timothy Brown
                Saadia Hashmi
                Elizabeth Donohoe
                Zachary Benson
                767 Third Avenue, Suite 2501
                New York, NY 10017
                Telephone: (516) 922-5427

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
       shashmi@thebrownlawfirm.net
       edonohoe@thebrownlawfirm.net
       zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Julian Keippel, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13___ day of August, 2025.

DocuSigned by:

*Julian keippel*

FC4C2DB5F675447...

Julian Keippel